IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LEGENDS SALES AND MARKETING, LLC, a limited liability company, | ) ) ) | CASE NO. |
| Plaintiff, | ) ) | |
| vs. | ) ) | COMPLAINT FOR DECLARATORY JUDGMENT |
| WEST HAYMARKET JOINT PUBLIC AGENCY, a political subdivision of the State of Nebraska, | ) ) ) ) | |
| Defendant. | ) | |

The plaintiff, for its cause of action against defendant, alleges:

## INTRODUCTION

1.     This is a civil action arising under the Declaratory Judgment Act, 28 U.S.C §§ 2201 and 2202 seeking a declaration of the rights and legal relations of the parties under a written contract.

## PARTIES

2.     Plaintiff Legends Sales and Marketing, LLC (Legends) is a limited liability company organized under the laws of Delaware with its principal place of business in New York.

3.     Defendant West Haymarket Joint Public Agency (JPA) is a political subdivision of the State of Nebraska pursuant to NEB. REV. STAT. § 13-2519.

## JURISDICTION

4.      Subject matter jurisdiction herein is based upon diversity of citizenship between the parties pursuant to 28 U.S.C. §1332. The amount in controversy, exclusive of interest and

costs, exceeds the sum specified by 28 U.S.C. § 1332. This court has jurisdiction over Plaintiff's request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.      This court has personal jurisdiction over this matter and these parties because the Defendant is located in this district and the parties performed under the contract at issue in this action in Nebraska.

## VENUE

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the parties performed under the contract in this district, all of the events giving rise to the claims made in this complaint have occurred or will occur in this district, and the defendant JPA is a political subdivision located in this district.

## STATEMENT OF FACTS

7.      On or about October 19, 2010, the JPA and CSL Marketing Group (CSL) entered into a Consultant Agreement for professional marketing services for the Pinnacle Bank Arena located in Lincoln, Lancaster County, Nebraska. Through that Agreement CSL agreed to plan and execute a comprehensive sales campaign for naming rights, sponsorships and premium seating for the Pinnacle Bank Arena. The objective of the Consultant Agreement was to maximize revenues to the JPA for the arena project. In consideration, the JPA agreed to compensate CSL for the services it provided as set forth in Attachment "A" to the Consultant Agreement. Attached hereto as Exhibit "A" and incorporated herein by this reference is a true and accurate copy of the Consultant Agreement.

8.      On or about February 7, 2012, CSL assigned its rights and responsibilities under the Consultant Agreement to Legends with the consent of the JPA. Attached hereto as Exhibit "B" and incorporated herein by this reference is a true and accurate copy of the assignment and consent to assignment.

9.      Pursuant to the assignment, Legends is the real party in interest with respect to the Consultant Agreement.

10.     As a result of Legends' professional marketing services, on or about December 6, 2011, the JPA and Pinnacle Bank entered into an agreement whereby the JPA sold the title sponsorship (also referred to as the naming rights) for the arena to Pinnacle Bank for $11,250,000.00 (eleven million two hundred fifty thousand dollars). The JPA publically announced that the naming rights were sold to Pinnacle Bank for $11,250,000.00.

11.     The unambiguous terms of the Consultant Agreement entitle Legends to commissions as a result of the sale of the arena title sponsorship to Pinnacle Bank for $11,250,000.00. Pursuant to the Consultant Agreement the commissions owing to Legends are due to be paid in equal installments with the final installment being paid no later than two years after the opening of the Pinnacle Bank Arena. The final installment is due in August 2015.

12.     Legends has performed all conditions of the Consultant Agreement.

13.     The JPA has failed to account to Legends for the full value of commissions to be paid under the Consultant Agreement for securing the Title Sponsorship Agreement with Pinnacle Bank. Specifically, the JPA has accounted to Legends and indicated that it intends to pay commissions for the sale of the title sponsorship on the amount of $6,731,958.00, denying commissions to Legends in the amount of $596,051.00. The amount of $6,731,958.00 is the discounted amount actually paid by Pinnacle Bank pursuant to its unilateral exercise of an acceleration provision in the Title Sponsorship Agreement. The JPA's accounting is incorrect under the unambiguous terms of Consultant Agreement.

14.     An actual, live and justifiable controversy exists between the parties with respect to the commissions owing to Legends under the Consultant Agreement. This matter is ripe for

review because the issue is largely legal in nature, may be resolved without further factual development, and judicial resolution will largely settle the parties' dispute.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for a final order of judgment against Defendant as follows:

A.  Declaring that the Consultant Agreement requires that the commission to be paid to Legends for the sale of the title sponsorship to Pinnacle Bank is based on the full sale price of $11,250,000.00;

B.  Ordering the JPA to account to Legends for the full value of commissions to be paid to Legends under the Consultant Agreement, including $596,051.00 in commissions to be paid on the full sale price of $11,250,000.00 for securing the Title Sponsorship Agreement with Pinnacle Bank;

C.  For attorney's fees and other costs of this action; and

D.  For any such other relief as the Court deems just and equitable.


LEGENDS SALES AND MARKETING, Plaintiff

BY:   Baylor, Evnen, Curtiss, Grimit & Witt, LLP
Wells Fargo Center
1248 "O" Street, Suite 600
Lincoln, NE  68508
(402)475-1075


BY:   ___/s/ Gail S. Perry_____
Gail S. Perry, # 17569
Torrey J. Gerdes, # 23924

## **PLACE OF TRIAL**

The plaintiff requests trial in the above-captioned matter be held in Omaha, Nebraska.

BY:     /s/ Gail S. Perry
              Gail S. Perry, # 17569
              Torrey J. Gerdes, # 23924

867604

WH 10-09

Substitute
MOTION TO AMEND NO. 1

I hereby move to amend Bill No. 10-09 in the following manner:

1.    Amend the Consultant Agreement attached to Bill No. WH 10-09 by:

    a.    Adding new recitals B and C to read as follows:

B.

It is recognized by and between Consultant and JPA that JPA's

Naming Rights to the Arena are subject to a Memorandum of

Understanding ("MOU") between the University of Nebraska Lincoln

("UNL") and the City of Lincoln, Nebraska.  The MOU provides, and

requires that UNL will enter into a lease with the JPA ("UNL Lease") for

use of the Arena which shall also provide, that UNL and JPA shall

cooperate in the sale and promotion of Naming Rights and that UNL shall

have an opportunity and right to register objections to sponsors or the

conferral of Naming Rights to entities which it believes will not reflect well

on UNL or its image.

C.

It is also recognized by and between Consultant and JPA that

JPA's Naming Rights to the Arena and West Haymarket District are

subject to JPA's sole discretion as to the propriety of the name or the

product it represents for a public facility and/or public space.

    b.    Relettering the subsequent Recitals accordingly.

    c.    Amending Article IV Compensation to read as follows:

Exhibit A

IV.

Compensation

The JPA agrees to pay Consultant for the services set forth in Attachment "A" the fees set forth in Attachment "A".  It is agreed by and between Consultant and JPA that JPA may refuse to enter into any contract or agreement with any person or entity on the basis that UNL has expressed an objection to the sale or conferral of Naming Rights to that person or entity.  Consultant hereby agrees that any such refusal by JPA on that basis is reasonable and proper according to this Consultant Agreement, and that Consultant shall not be entitled to receive any commission or compensation by reason of any proposed or prospective sale that is the subject of, or the failure or inability to consummate any sale because of, such refusal.

It is further agreed by and between Consultant and JPA that JPA may refuse to enter into any contract or agreement with any person or entity on the basis that the JPA in its sole discretion, believes to be inappropriate for the Arena or for any other public facility or public space in the West Haymarket District.

d.    Substituting the attached Marketing Service and Marketing Budget as Attachments A and B respectively to the Consultant Agreement.

Introduced by:

_Chris Butler_

Approved as to Form & Legality:

_____
Legal Counsel for
West Haymarket Joint Public Agency

Requested by: Law Department

Reason for Request:  To incorporate the latest version of the Marketing Services and Marketing Budget.

-3-

## CONSULTANT AGREEMENT

THIS AGREEMENT is entered into this _19ᵗʰ_ day of _October_ , 2010, by and between the West Haymarket Joint Public Agency, hereinafter referred to as "JPA" and CSL Marketing Group, 7200 Bishop Road, Suite 220, Plano, TX 75024, hereinafter referred to as "Consultant."

### RECITALS

#### A.

The JPA proposes to engage Consultant in accordance with the terms and conditions set forth herein to render professional assistance in providing marketing services for the West Haymarket Arena and Haymarket District, as more fully set forth in Attachment "A" (hereinafter referred to as "Consultant Services").

#### B.

Consultant possesses certain skills, experience, education and competency to perform the Consultant Services on behalf of the JPA, and the JPA desires to engage Consultant for such Consultant Services on the terms herein provided.

#### C.

Consultant hereby represents that Consultant is willing and able to perform the Consultant Services in accordance with the proposed Consultant Services submitted with this Agreement.

#### D.

The City of Lincoln, Nebraska, a municipal corporation and member of the JPA, shall provide support and administrative services under this Agreement with the Lincoln Municipal Code as the source of several clauses in this Agreement.

-1-

NOW, THEREFORE, IN CONSIDERATION of the above Recitals and the mutual obligations of the parties hereto, the parties do agree as follows:

## I.

## ADMINISTRATOR OF AGREEMENT

The Project Manager of the JPA shall be the JPA's representative for the purposes of administering this Agreement and shall have authority on behalf of the JPA to give approvals under this Agreement.  A representative to be designated by the Consultant, will supervise all services and be in charge of performance of the Consultant Services as set forth in this Agreement.

## II.

## SCOPE OF SERVICES

Consultant agrees to undertake, perform and complete in an expeditious, satisfactory and professional manner the services set forth in Attachment A on behalf of the JPA.  In the event there is a conflict between the terms of Attachment A and this Agreement, the terms of this Agreement shall control.

## III.

## TERM OF AGREEMENT

The term of this Agreement shall commence effective September 1, 2010 upon execution of this Agreement by both parties and shall continue through October 31, 2013 or sixty (60) days after opening of the Arena, whichever is later.  Consultant shall have the right to extend the term of this Agreement upon the same terms and conditions for two additional periods of one year each upon receipt of written notice delivered to the JPA on or before the date of expiration of the term or any additional extended term thereafter.

*10-1-2010 - Law*

# IV.
## COMPENSATION

The JPA agrees to pay Consultant for the services set forth in Attachment "A" the Professional Fees set forth in Attachment "A" in accordance with the Marketing Budget set forth in Attachment "B". The Marketing Budget shall not be amended nor exceeded without the prior written approval of the JPA.

# V.
## SERVICES TO BE CONFIDENTIAL

All services, including reports, opinions and information to be furnished under this Agreement shall be considered confidential and shall not be divulged, in whole or in part, to any person other than to duly authorized representatives of the JPA, without the prior written approval of the JPA or by order of a court of competent jurisdiction. The provisions in this section shall survive any termination of this Agreement.

# VI.
## NON-RAIDING CLAUSE

Consultant shall not engage the services of any person or persons presently in the employ of the City of Lincoln, Nebraska for work covered by this Agreement without the written consent of the City of Lincoln, Nebraska.

# VII.
## TERMINATION OF AGREEMENT

A.   This Agreement may be terminated by the Consultant if the JPA fails to adequately perform any material obligation required by this Agreement ("Default"). Termination rights under this paragraph may be exercised only if the JPA fails to cure a Default within ten (10) calendar days after receiving written notice from the Consultant specifying the nature of the Default.

-3-

*10-1-2010 - Law*

B.     The JPA may terminate this Agreement, in whole or part, for any reason for the JPA's own convenience upon at least ten days written notice to the Consultant.

If the Agreement is terminated by either the JPA or Consultant as provided in A or B above, Consultant shall be paid for all services performed, and reimbursable expenses incurred, not to exceed the above-mentioned Agreement amounts, up until the date of termination.  In either such event, JPA agrees to compensate or assume payment for any outstanding lease agreements (including office space and apartments) Consultant signed in performing its work for the JPA.

Further, Consultant agrees that, upon termination as provided in this paragraph, it shall not be employed by any developer or other party who is or may be interested in the work effort as defined in Article II, or interested in the decisional process relating to the application of such findings as may result from the tasks performed as defined in Article II for a period of one (1) year after such termination, without prior approval of the JPA.

## VIII.
### ADDITIONAL SERVICES

The JPA may from time to time, require additional services from the Consultant including but not limited to, special reports, graphics, attendance at meetings or presentations. Such additional services, including the amount of compensation for such additional services, which are mutually agreed upon by and between the JPA and Consultant shall be effective when incorporated in written amendments to this Agreement.

## IX.
### FAIR EMPLOYMENT

In connection with the performance of work under this Agreement, Consultant agrees that it shall not discriminate against any employee or applicant for employment with respect to compensation, terms, advancement potential, conditions, or privileges of employment, because

-4-

of such person's race, color, religion, sex, disability, national origin, ancestry, age, or marital status in accordance with the requirements of Lincoln Municipal Code Chapter 11.08 and *Neb. Rev. Stat.* § 48-1122, as amended.

## X.

## FAIR LABOR STANDARDS

The Consultant shall maintain Fair Labor Standards in the performance of this Agreement as required by Chapter 73, Nebraska Revised Statues, as amended.

## XI.

## ASSIGNABILITY

The Consultant shall not assign any interest in this Agreement, except for the work of the Subconsultants identified in this Agreement, delegate any duties or work required under this Agreement, or transfer any interest in the same (whether by assignment or novation), without the prior written consent of the JPA thereto; provided, however, that claims for money due or to become due to the Consultant from JPA under this Agreement may be assigned without such approval, but notice of any such assignment shall be furnished promptly to the JPA.

## XII.

## INTEREST OF CONSULTANT

Consultant covenants that Consultant presently has no interest, including but not limited to, other projects or independent contracts, and shall not acquire any such interest, direct or indirect, which would conflict in any manner or degree with the performance of services required to be performed under this Agreement. Consultant further covenants that in the performance of this Agreement, no person having any such interest shall be employed or retained by Consultant under this Agreement.

*10-1-2010 - Law*

## XIII.

## OWNERSHIP, PUBLICATION, REPRODUCTION
## AND USE OF MATERIAL

Consultant agrees to and hereby transfers all rights, including those of a property or copyright nature, in any reports, studies, information, data, digital files, imagery, metadata, maps, statistics, forms and any other works or materials produced under the terms of this Agreement.  No such work or materials produced, in whole or in part, under this Agreement, shall be subject to private use or copyright by Consultant without the express written consent of JPA.

The JPA shall have the unrestricted rights of ownership of such works or materials and may freely copy, reproduce, broadcast, or otherwise utilize such works or materials as the JPA deems appropriate.  The JPA shall also retain all such rights for any derivative works based on such works or materials.

## XIV.

## COPYRIGHTS, ROYALTIES & PATENTS

Without exception, Consultant represents the consideration for this Agreement includes Consultant's payment for any and all royalties or costs arising from patents, trademarks, copyrights, and other similar intangible rights in any way involved with or related to this Agreement. Further, Consultant shall pay all related royalties, license fees, or other similar fees for any such intangible rights. Consultant shall defend suits or claims for infringement of any patent, copyright, trademark, or other intangible rights that Consultant has used in the course of performing this Agreement.

## XV.

## COPYRIGHT; CONSULTANT'S WARRANTY

A.     Consultant represents that all materials, processes, or other protected rights to be used in the Consultant Services have been duly licensed or authorized by the appropriate parties for such use.

B.     Consultant agrees to furnish the JPA upon demand written documentation of such license or authorization. If unable to do so, Consultant agrees that the JPA may withhold a reasonable amount from Consultant's compensation herein to defray any associated costs to secure such license or authorization or defend any infringement claim.

## XVI.

## INDEMNIFICATION

A.     Consultant's Duty.  To the fullest extent permitted by law, Consultant shall indemnify and hold harmless the JPA, its members, representatives of the members, officers, agents, and employees, as indemnitees, from and against all claims, damages, losses, and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of this Agreement, that results in any claim for damage whatsoever, including without limitation, any bodily injury, sickness, disease, death, or any injury to or destruction of tangible or intangible property, including any loss of use resulting therefrom, that is caused in whole or in part by the negligence, gross negligence, or intentional tort of the Consultant or anyone directly or indirectly employed by Consultant or anyone for whose acts any of the them may be liable.  This section will not require Consultant to indemnify or hold harmless the JPA for any losses, claims, damages, and expenses arising out of or resulting from the negligence of the JPA.  The JPA does not waive its governmental immunity by entering into this Agreement and fully retains all immunities and defenses provided by law with regard to any action based on this Agreement.  The provisions of this section survive any termination of this Agreement.

-7-

B      Total Liability.  The total liability of the Consultant arising under, in connection with or out of this Agreement, whether in contract, tort, or any legal or equitable theory of recovery, shall not exceed $2,000,000.00 (Two Million Dollars).

C.     Consequential Damages.    Consultant shall not be liable for any indirect, incidental or consequential loss, injury or damage or liability, including but not limited to loss of profit, business, production, income or revenue, reputation, or any other consequential damages incurred from any cause of action whatsoever.

## XVII.
## INSURANCE

A.     Insurance Coverage.  At all times during the term of this Agreement, the Consultant shall maintain insurance coverage as follows:

1.     Workers' Compensation; Employer's Liability.  Such insurance coverage as will fully protect both Consultant and JPA from any and all claims under any Worker's Compensation Act or Employer's Liability Law. Consultant shall exonerate, indemnify and hold harmless the JPA from and against, and shall assume full responsibility for payment of all federal, state, and local taxes and contributions imposed or required under unemployment insurance, social security and income tax laws with respect to Consultant or any such employees of Consultant as may be engaged in the performance of this Agreement.  The minimum acceptable limits of liability to be provided by such Workers' Compensation policy shall be as follows:

-8-

| Coverage | Listing | Min. Amt | Notes |
|---|---|---|---|
| **Worker's Comp.** | | | |
| | State | Statutory | |
| | Applicable Federal | Statutory | |
| **Employer's Liability** | | | |
| | Bodily Injury by accident | $500,000 | each accident |
| | Bodily Injury by disease | $500,000 | each employee |
| | Bodily Injury | $500,000 | policy limit |

2.     Automobile Liability Insurance.  For all of the Consultant's automobiles, including owned, hired and non-owned automobiles, Consultant shall keep in full force and effect such Automobile Liability Insurance as shall protect it against claims for damages resulting from bodily injury, including wrongful death, and property damage which may arise from the operations of any owned, hired, or non-owned automobiles used by or for it in any capacity in connection with the carrying out of this contract. The minimum acceptable limits of liability to be provided by such Automobile Liability Insurance shall be as follows:

i.     Bodily Injury Limit          $500,000 Each Person/$1,000,000 Each Occurrence

ii.    Property Damage Limit     $500,000 Each Occurrence

iii.   Combined Single Limit     $1,000,000 Each Occurrence

3.     General Liability Insurance.  General Liability Insurance, naming and protecting Consultant and the JPA and the City of Lincoln, its officials, employees and volunteers as insured, against claims for damages resulting from (a) all acts or omissions, (b) bodily injury, including wrongful death, (c) personal injury liability, and (d) property damage which may arise from operations under this Agreement whether such operations by Consultant and Consultant's employees, students, or those directly or indirectly employed by Consultant. The minimum acceptable limits of liability to be provided by such insurance shall be as follows:

i.     All Acts or Omissions - $2,000,000 Aggregate;

-9-

    ii.    Bodily Injury/Property Damage - $2,000,000 Aggregate;

    iii.   Personal Injury and Advertising - $1,000,000 each Occurrence;

    iv.   Contractual Liability - $1,000,000 each Occurrence;

    v.    Products Liability and Completed Operations - $1,000,000 each Occurrence;

    vi.   Medical Expenses (any one person) - $10,000.

If the Consultant does not possess General Liability Insurance in the amounts as provided in this Agreement, the Consultant may use Excess or Umbrella Insurance to supplement the General Liability Insurance to reach the minimum acceptable limits of liability as provided in this Agreement.

    4.    <u>Professional Liability Insurance</u>.  Professional Liability Insurance, naming and protecting Consultant against claims for damages resulting from the Consultant's errors, omissions, or negligent acts. Such policy shall contain a limit of liability not less than One Million Dollars ($1,000,000) per claim and aggregate.

    B.    <u>Minimum Scope of Insurance</u>.  All liability insurance policies (except Professional Liability) shall be written on an "occurrence" basis only, except for professional liability insurance which may be based upon a "claims-made" basis. All insurance coverages are to be placed with insurers authorized to do business in the State of Nebraska and must be placed with an insurer that has an A.M. Best's Rating of not less than A:VIII unless specific approval has been granted by the JPA.

    C.    <u>Deductibles</u>.  All deductibles on any policy shall be the responsibility of the Consultant and shall be disclosed to the JPA at the time the evidence of insurance is provided.

*10-1-2010 - Law*

   D. <u>Memorandum of Insurance</u>.  All Memoranda of Insurance shall be filed with the City showing the specific limits of insurance coverage required by the preceding sections, and showing the JPA and the City of Lincoln as additional insureds for General Liability Insurance and Excess or Umbrella Insurance if used to supplement the General Liability Insurance. The Consultant may present evidence of equivalent self-insurance, satisfactory to the JPA,  in place of a certificate of insurance for General Liability Insurance.  The JPA shall be treated as an additional insured as if the Consultant possessed General Liability Insurance.  Such memorandum shall specifically state that insurance policies are to be endorsed to require the Consultant to provide the JPA thirty (30) days notice of reduction in amount, increase in deductibles, cancellation, or non-renewal of insurance coverage.

**XVIII.**

**NOTICE**

   Any notice or notices required or permitted to be given pursuant to this Agreement may be personally served on the other party by the party giving such notice, or may be served by fax, commercial carrier or certified mail, postage prepaid, return receipt requested to the following addresses:

West Haymarket Joint Public Agency   CSL Marketing Group
Attn: Dan Marvin         Attn: Bill Rhoda
555 South 10th Street, Suite 301    7200 Bishop Road, Suite 220
Lincoln NE 68508         Plano, TX 75024
(402) 441-7511          (972) 491-6900

-11-

## XIX.

### INDEPENDENT CONTRACTOR

The JPA is interested only in the results produced by this Agreement.  Consultant has sole and exclusive charge and control of the manner and means of performance.  Consultant shall perform as an independent contractor and it is expressly understood and agreed that Consultant is not an employee of the JPA and is not entitled to any benefits to which JPA employees are entitled, including, but not limited to, overtime, retirement benefits, workmen's compensation benefits, sick leave and/or injury leave.

## XX.

### NEBRASKA LAW

This Agreement shall be construed and interpreted according to the laws of the State of Nebraska.

## XXI.

### INTEGRATION

This Agreement represents the entire agreement between the parties and all prior negotiations and representations are hereby expressly excluded from this Agreement.

## XXII.

### AMENDMENT

This Agreement may be amended or modified only in writing signed by both the JPA and Consultant.

## XXIII.

### SEVERABILITY

If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.  If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such

-12-

provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

## XXIV.

## WAIVER OF CONTRACTUAL RIGHT

The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

## XXV.

## AUDIT AND REVIEW

The Consultant shall be subject to audit pursuant to Chapter 4.66 of the Lincoln Municipal Code and shall make available to a contract auditor, as defined therein, copies of all financial and performance related records and materials germane to this Agreement, as allowed by law.  The Consultant shall also be subject to audits required by the State and shall make available to any authorized auditor.

## XXVI.

## FEDERAL IMMIGRATION VERIFICATION

A.   If the Consultant is a business entity or corporation, then in accordance with Neb. Rev. Stat. §§ 4-108 through 4-114, the Consultant agrees to register with and use a federal immigration verification system, to determine the work eligibility status of new employees performing services within the State of Nebraska.  A federal immigration verification system means the electronic verification of the work authorization program of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 USC 1324 a, otherwise known as the E-Verify Program, or an equivalent federal program designated by the United States Department of Homeland Security or other federal agency authorized to verify the work eligibility status of a newly hired employee pursuant to the Immigration Reform and Control Act of 1986.  The

-13-

Consultant shall not discriminate against any employee or applicant for employment to be employed in the performance of this section pursuant to the requirements of state law and 8 U.S.C.A. 1324b. The Consultant shall require any subcontractor to comply with the provisions of this section.  For information on the E-Verify Program, go to www.uscis.gov/everify.

## XXVII.

## REPRESENTATIONS

Each party hereby certifies, represents and warrants to the other party that the execution of this Agreement is duly authorized and constitutes a legal, valid and binding obligation of said party.

IN WITNESS WHEREOF, Consultant and the JPA do hereby execute this Agreement as of the Execution Date set forth above.

**WEST HAYMARKET JOINT PUBLIC**

**AGENCY**

By: _____
Jayne Snyder, Chair
Board of Representatives

**CSL MARKETING GROUP**

By: _____
Title: President

-14-

ATTACHMENT "A"

MARKETING SERVICES

Consultant has developed a scope of services for the JPA for the planning, development and execution of marketing services to maximize revenues for the new Arena. Consultant will plan and execute comprehensive sales campaigns for naming rights, sponsorships and premium seating.

The services provided by Consultant will be divided into two phases:
- Phase I Naming Rights, Sponsorship and Premium Seating Analysis and Planning
- Phase II Naming Rights, Sponsorship and Premium Seating Sales Execution

**Phase I Analysis and Planning**
Consultant will evaluate the potential demand for naming rights, sponsorships and premium seating at the Arena and develop recommendations regarding the naming rights, sponsorships and premium seating concepts, inventory, pricing, locations and potential amenities.

Consultant's Phase I services will include, but are not limited to the following:

1. **Situation / Comparative Analysis** - Review existing sponsorship and premium seating packages at the Pershing Center, Memorial Stadium, the Bob Devaney Sports Center and other Omaha area venues. In addition, we will review other comparable collegiate and municipal naming rights, sponsorship and premium seating programs including the following:
   - Entitlements;
   - signage inventory and number of partnerships;
   - premium seating packages including types, inventory and pricing; and,
   - current trends in naming rights, sponsorships and premium seating.

2. **Market Analysis** - Develop an in-depth analysis to determine the most appropriate naming rights, sponsorship and premium seating inventory and pricing. Consultant will analyze the marketability of each specific concept using research methods that may include telephone surveys, email surveys, one-on-one interviews and focus groups. The market analysis will provide a better understanding of and assess the following:
   - Potential interest in proposed premium seating concepts;
   - location preferences for premium seating;
   - sensitivity to potential price points for premium seating;
   - perceived value of premium seating benefits and amenities;
   - interest in naming rights and sponsorships;
   - potential sales processes;
   - impact of other sports venues in the area; and,
   - other key issues.

3. **Architectural Interface**
   - Consult with architects and project principals on seating bowl design, premium seating configuration and fan amenities that maximize revenue and minimize potential operating expenses
   - Work with architects and project principals to review traffic flow and sightlines to determine the optimal locations for signage in the seating bowl, around the concourses and on the exterior of the arena to maximize naming rights and sponsorship opportunities

4. **Yield Analysis** - Determine the optimum mix of naming rights opportunities, sponsorship zones, signage and premium seat products to generate maximum revenue.

5. **Naming Rights / Sponsorship Valuation** - Determine the optimum mix of naming rights opportunities, sponsorship zones, signage and premium seat products to generate maximum revenue.
   - Asset Identification - Identify and quantify tangible assets for potential inclusion in naming rights and sponsorship packages including but not limited to the following:
     - On-site advertising
     - Broadcast exposure
     - Editorial media coverage
     - Publications
     - Collateral material
     - Promotional opportunities
     - Event marketing
     - Internet
     - Premium seating
     - Ticketing
     - Merchandising
   - Asset Valuation - Measure the tangible and intangible benefits and determine the values of naming rights and sponsorship packages using asset models, impression models, comparables and market conditions.

6. **Pricing and Packaging**
   - Develop naming rights and sponsorship packages including pricing, term and benefits
   - Create premium seat packages including quantity, configuration, pricing, terms, benefits and amenities.

7. **Marketing Plan / Sales Strategy** - Develop a comprehensive naming rights, sponsorship, and premium seat marketing plan to serve as a template for execution of sales programs. The marketing plan will include the following:
   - Sales Objectives and Revenue Goals - Develop goals for naming rights, sponsorships and premium seating
   - Sales Strategy - Identify strategies for positioning and marketing naming rights, sponsorships and premium seating to VIPs, arena vendors, existing premium seat holders, season ticket holders, and the general public
   - Prospect Action Plan - Create specific tactics, messages, action steps and sales forecasts for each group of prospects

- Client Interface - Develop a communications plan for existing arena clients
- Premium Seat Holder Priority - Determine priority (location, seniority or other) for purchase of new premium seat options
- Public Relations - Plan to support sales programs
- Sales Functions - Create a detailed list of monthly and/or weekly events to attract prospects and introduce products
- Sales / Project Timeline - Prepare a timeline detailing release dates (sales sequence) for naming rights, sponsorships and premium seating, sales tactics, sales functions, key dates, arena milestones and responsibilities

8. **Database Development** - Identify local, regional, national and international companies and organizations best suited for purchasing naming rights, sponsorships and premium seating

9. **Sales / Marketing Center** - Develop sales / marketing center including site location, design and build-out as headquarters for sales activities and construction tours.

10. **Printed Collateral -** Work with creative firms to develop and produce naming rights, sponsorship and premium seating brochure(s) and other ancillary sales materials (as necessary).

11. **Presentation Materials -** Develop computer and/or audio-visual presentations for both sales / marketing center and remote sales presentations.

12. **Website -** Develop West Haymarket Arena website to provide project updates, disseminate sponsorship and premium seating information and answer frequently asked questions.

13. **Sales / License Agreements -** Develop the naming rights, sponsorship and premium seat agreements.


**Phase II Sales Execution**

Consultant will plan and execute comprehensive turnkey sales campaigns to market naming rights, sponsorships and premium seating for the new Arena. Consultant principals will direct the execution of the sales programs and provide the following services:

1. **Turnkey Sales -** Targeting of prospects, execution of initial sales calls and all required follow-up to close.

2. **Sales Tactics -** Execute tactics to create awareness and engage prospects. Tactics include but are not limited to the following
   - Sales / Marketing Center Grand Opening and Press Conference
   - Sales / Marketing Center Presentations
   - Arena Tours
   - Events centered around Arena announcements such as the unveiling of the design and groundbreaking

- Host prospects at Sales / Marketing Center events
- Utilize existing media opportunities at the Pershing Center to deliver messages
- Identify and participate in area events that align with our target demographic
- Direct Mail Campaigns
- Email Campaigns

3. **Sales Functions** - Plan and coordinate overall sales "kick-off function", as well as other sales functions including meetings, presentations, events and social functions designed to attract prospects and sell products.

4. **Sales Meetings** - Conduct regular sales meetings with the, JPA and Owners Respresentative.

5. **Sales Reports** - Provide ongoing communication and weekly sales, milestone and prospective business reports to keep, JPA, Owners Representative and project principals informed of Consultant's progress.

6. **File Maintenance** - Maintain the sponsorship and premium seating account files.

7. **Seat Selection** - Develop a plan to that allows club seat purchasers to select their seat locations based on priority.

8. **Contract Administration** - Manage the contract execution process.

9. **Customer Service** - Coordinate program to keep customers informed, involved and satisfied with their purchase(s). Direct jointly with the JPA and Owners Representative the customer service rollout of the arena plans.

## PROFESSIONAL FEES

Consultant shall receive the following compensation for its work on behalf of the JPA with marketing services for the West Haymarket Arena and the Haymarket District:

1. **Monthly Retainer.** During the Term, JPA shall pay Consultant a monthly fee ("Monthly Retainer") of $16,000 per month.

2. **Budget.** In addition to the Monthly Retainer, the JPA shall reimburse consultant for the expenses actually incurred by Consultant during the Term on a monthly basis in accordance with the Marketing Budget ("Budget") in Attachment B, which is incorporated herein by reference.

3. **Sales Commissions**. Consultant will be paid Commissions on all gross term revenue for the West Haymarket Arena and Haymarket Arena Products as outlined in the following schedule:

| Gross Term Revenue | Commission Rate |
|---|---|
| $0 - $20,000,000 | 5.0% |
| $20,000,001 - $30,000,000 | 7.0% |
| $30,000,001 - $40,000,001 | 12.0% |
| $40,000,001 + | 14.0% |

Gross term revenue is defined as gross revenue payable to the JPA under the full initial term of any agreement, including any and all revenue received under any escalation provision before offset for any expenses and without deduction for Arena event cancellations or postponements, or any refunds paid by the JPA. Gross term revenue shall also include the fair market value of any in-kind contribution received by the JPA in exchange for any benefit granted by the JPA.

As to sales to be counted in calculating the amount of Commissions earned and due to Consultant, a sale shall be deemed completed upon signature of the agreement or contract by the West Haymarket Arena or Haymarket District customer and the JPA; provided, however, that Consultant shall receive credit for any sales initiated during the Term and concluded within 90 days after the expiration or termination of this Agreement. The JPA shall negotiate in good faith any changes to the form agreement or contracts requested by requested West Haymarket Arena or Haymarket District customers and the JPA shall use reasonable efforts to conclude a sale within 10 days after Consultant forwards an agreement or contract executed by the West Haymarket Arena or Haymarket District customer to the JPA.

The commissions earned for year 1 revenue will be paid monthly as revenues are received by the JPA. Commissions due Consultant for years two and beyond for multi-year agreements shall be paid by the JPA in equal installments with the final installment being paid no later than two years after the opening of the West Haymarket Arena.

## CONDITIONS OF OUR WORK

During the term of this contract, Consultant will formulate a marketing program for the West Haymarket Arena and Haymarket District and will act as the JPA's sole and exclusive representative for marketing West Haymarket Arena and Haymarket District products including, but not limited to the following:

1. Haymarket District Naming Rights
2. West Haymarket Arena Naming Rights
3. Common area (defined to include, but not limited to plazas, walkways an connectors) Naming Rights, Sponsorships and Signage
4. Naming Rights to areas inside and outside the West Haymarket Arena (including but not limited to entrances, lobbies, concourses, clubs, restaurants, box office, and other designated areas)
5. Scoreboard (including, but not limited to video board, electronic signage, rottaing signage and static signage)
6. West Haymarket Arena Signage
7. Haymarket District Signage
8. Exterior Marquee Signage
9. Public Address Announcements
10. Display Rights
11. West Haymarket Arena Promotions
12. Haymarket District Promotions
13. Concessions Rights
14. Pouring Rights
15. Official Suppliers
16. Website advertisements and features
17. Suite Licenses
18. Loge Box Licenses
19. Club Seat Licenses
20. Other Premium Seating Licenses

The term "Premium Seating" shall mean seating sold at the West Haymarket Arena or Haymarket District with special amenities.

JPA cannot sell, assign, sublet, transfer, grant or license to any other party the exclusive rights granted to Consultant under this Agreement.

The JPA agrees to promptly refer all leads for purchasers of West Haymarket Arena and Haymarket District products to Consultant.

Consultant shall market West Haymarket Arena and Haymarket District products using the agreements and contracts provided or approved by the JPA. All agreements and contracts shall

be directly between the JPA and the West Haymarket Arena and Haymarket District purchasers. JPA hereby acknowledges and agrees that Consultant is not guarantying any level of purchase of, or the receipt of payment for, any West Haymarket Arena and Haymarket District products marketed by Consultant.

# ATTACHMENT "B"

## MARKETING BUDGET

| Category | September to December 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|
| CSLMG Retainer[1] | $64,000 | $192,000 | $192,000 | $160,000 | $608,000 |
| Sales Center Staff[2] | 0 | $39,000 | $40,560 | $35,138 | $114,698 |
| Sales Support[3] | 0 | 100,000 | 75,000 | 75,000 | 250,000 |
| Sales Center Buildout[4] | 0 | 175,000 | 0 | 0 | 175,000 |
| Sales Center Operations[5] | 4,790 | 28,740 | 28,740 | 23,950 | 86,220 |
| Arena Model[6] | 0 | 75,000 | 0 | 0 | 75,000 |
| Audio-Visual[7] | 0 | 50,000 | 0 | 0 | 50,000 |
| Architectural Sales Tools[8] | 0 | 15,000 | 0 | 0 | 15,000 |
| Website[9] | 0 | 50,000 | 0 | 0 | 50,000 |
| Functions[10] | 0 | 50,000 | 25,000 | 25,000 | 100,000 |
| **Project Total** | **$68,790** | **$774,740** | **$361,300** | **$319,088** | **$1,523,918** |

1  Retainer - $16,000 per month (includes sales director, travel and operation of a 1,200 sq. ft. Office)
2  Administrative Assistant for the Public Sales Center
3  Sales brochures, direct mail, invitations, invoices, postage, miscellaneous printing, etc.
4  Build-out of a 2,500 sq. ft. sales center in Haymarket District to include suite mock-up and A/V presentation.
5  Rent, utilities and other expenses for sales center.
6  Scale arena model with removable roof, removable floors to be displayed at the sales center.
7  Sales video with three dimensional arena fly-thru.
8  Renderings, computer generated images, plan view diagrams and section diagrams.
9  Website update with interactive 3-D arena model and seat selector.
10  "Kick-off" event, sales functions, open houses, prospect events, etc.

## ASSIGNMENT and ACCEPTANCE
### CSL MARKETING GROUP TO LEGENDS SALES & MARKETING, LLC

For valuable consideration, CSL Marketing Group hereby assigns and transfers to Legends Sales & Marketing, LLC, a Delaware limited liability company, all of the assets and liabilities of CSL Marketing Group, particularly including the benefits and obligations of the Consultant Agreement executed and dated October 19, 2010, between CSL Marketing Group and the West Haymarket Joint Public Agency, regarding the provision of professional marketing services for the West Haymarket Arena and West Haymarket District.

For valuable consideration, Legends Sales & Marketing, LLC, hereby accepts all of the assets and liabilities of CSL Marketing Group, particularly including the benefits and obligations of the Consultant Agreement executed and dated October 19, 2010, between CSL Marketing Group and the West Haymarket Joint Public Agency, regarding the provision of professional marketing services for the West Haymarket Arena and West Haymarket District.

Dated this ___ day of February, 2012.

CSL MARKETING GROUP,

By: _____
Bill Rhoda, President

LEGENDS SALES & MARKETING, LLC,

By: _____
Chad Estis, President

## CONSENT TO ASSIGNMENT

The West Haymarket Joint Public Agency, pursuant to paragraph XI of the Consultant Agreement entered into on October 19, 2010 between the West Haymarket Joint Public Agency and the CSL Marketing Group, hereby consents to the above Assignment and Acceptance.

WEST HAYMARKET JOINT PUBLIC AGENCY

By: _____
Chris Beutler, Chair
West Haymarket Joint Public Agency

Exhibit B